UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **BARBARA CULPEPPER** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-06-33** |
| | § | |
| **HOSPICE OF SOUTH TEXAS, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**ORDER**

Pending before the Court is Defendant's Motion For Summary Judgment (Dkt. #15). Having considered the motion, responses, reply, the record and the relevant law, the Court is of the opinion that the motion should be GRANTED.

**Procedural Background**

On May 4, 2005, Barbara Culpepper ("Culpepper") filed a charge with the Texas Workforce Commission Civil Rights Division alleging national origin, race, and age discrimination against Hospice of South Texas, Inc. ("Hospice"). The matter was assigned to the United States Equal Employment Opportunity Commission ("EEOC") for investigation. On January 23, 2006, the EEOC issued a right to sue letter.

On February 27, 2006, Culpepper commenced an action against Hospice in the 135th Judicial District Court of Victoria County, Texas. (Dkt. #1). Culpepper's Original Petition states the following claims: (1) wrongful termination based on race, age or gender under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the Texas Commission on Human Rights Act ("TCHRA"); (2) discriminatory job assignment under Title VII, the ADEA and the TCHRA; (3) retaliation under Title VII, the ADEA and the TCHRA;

(4) adverse employment decisions under Title VII, the ADEA and the TCHRA; (5) wrongful termination under the Texas Occupations Code; (6) failure to provide peer review under the Texas Occupations Code; (7) retaliation under the Texas Occupations Code; and (8) conspiracy among Susan Markland ("Markland"), Lori Koonce ("Koonce"), Lynda Morgan ("Morgan") and Hospice to deny peer review.

On March 21, 2006, Hospice removed Culpepper's state action to this Court.  Hospice asserted jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  This Court entered a Scheduling Order on June 2, 2006.

On May 15, 2007, Culpepper's counsel filed a Motion of Counsel to Withdraw.  (Dkt. #13). On June 4, 2007, Culpepper filed her Opposition to Grounds of Motion of Counsel to Withdraw. (Dkt. #14).  On July 7, 2007, Hospice filed Defendant's Motion For Summary Judgment.  (Dkt. #15).

On August 16, 2007, this Court conducted a phone conference with Culpepper, her counsel, and Hospice's counsel.  The Court heard arguments pertaining to the then-pending Motion of Counsel to Withdraw.  Subsequently, the Court entered an Order denying the motion to withdraw and instructed Culpepper's counsel to file a response to Hospice's motion for summary judgment.

On September 9, 2007, Culpepper's counsel filed a response to Hospice's motion for summary judgment stating that "[Culpepper] has no valid legal basis to oppose Defendant's Motion." (Dkt. #18).  On October 15, 2007, Culpepper filed another response to Hospice's motion for summary judgment.  (Dkt. #19).  On October 30, 2007, Hospice filed a reply to Culpepper's response.  (Dkt. #20).

**Factual Background**

2

Hospice's mission statement reads as follows: "The mission of Hospice of South Texas is to ensure palliative care and compassionate care to terminally ill patients so as to enhance natural death with dignity.  The physical, spiritual, psychological and social needs of patients and their families are addressed with special emphasis on family bereavement support."  (Dkt. #15-2 at 11-12).

On August 9, 2004, Hospice hired Culpepper, a licenced vocational nurse ("LVN"), to work in the capacity of a LVN on a part time, as needed, basis.  (Dkt. #15-2 at 44-45).  Culpepper was assigned to the Intensive Home Care ("IHC") program, (Dkt. #15-3 at 4-5, 6); (Dkt. #15-3 at 34), to give comfort care and medications.  (Dkt. #15-3 at 10).  Susan Markland,[1] Hospice's Director of Nursing, made the decision to hire Culpepper.  (Dkt. #15-3 at 34).  Culpepper and Markland are both Caucasian women of Dutch Irish national origin.  (Dkt. #15-2 at 29); (Dkt. #15-3 at 34).  At the time that Culpepper was hired, Markland was  47 years of age (Dkt. #15-3 at 34) and Culpepper was 54 years of age (Dkt. #15-4 at 23).

At all relevant times, Hospice had a policy of conducting an initial 90-day orientation and probationary period for new employees.  (Dkt. #15-3 at 34, 36-42).  Hospice's Personnel Handbook provides, in part, as follows:

<u>Orientation Period</u>

The first 90 days after the date of hire are considered an appraisal period.  This period gives the supervisor an opportunity to evaluate the ability with which the employee performs the job.  If the employee completes this orientation period, then the supervisor will evaluate the employee's performance and will discuss the evaluation with the employee.  During the appraisal period, as with any other period,

---

[1]  Prior to Markland's marriage in 2006, she was known as Susan Stubbs.  (Dkt. #15-3 at 33).

no advance notice is necessary for the employee to resign or for Hospice to terminate
the employee.

(Dkt. #15-3 at 37-38). According to the Hospice Policy and Procedure Manual, new employees are

to be introduced to Hospice's philosophy and practices during this initial period to "assure uniform

performances of patient services." (Dkt. #15-3 at 41). The policy and procedure manual also

indicates that orientation involves observation of client care and performance evaluations. (Dkt.

#15-3 at 42).

Hospice asserts that during Culpepper's 90-day orientation period, Culpepper's supervisors

observed that: (1) Culpepper was uncomfortable with the concept of hospice care; (2) Culpepper did

not understand or accept the concept of administering pain medication to hospice patients on an "as

needed" basis; (3) Culpepper was uncomfortable with Hospice personnel talking about patients

"actively dying" and was uncomfortable with physicians talking about patients dying; (4) Culpepper

had a tough time listening and communicating her thoughts; (5) Culpepper lacked critical thinking

skills; (6) Culpepper had a difficult time understanding simple instructions, including scheduling

instructions; (7) Culpepper did not work well with Hospice team members and had personality

clashes with staff; (8) Culpepper had a difficult time following the documentation of other staff

members and had a difficult time accepting the judgment of others. (Dkt. #15-3 at 18-22, 24, 27-29).

Hospice's claims are supported by summary judgment evidence, namely, the deposition testimony

of Susan Markland. (Dkt. #15-3 at 18-22, 24, 27-29).

Culpepper disputes the criticisms leveled at her by Hospice. In her brief, Culpepper claims

that: (1) she was "*not* uncomfortable with the fundamental concept of hospice care" and that "[s]he

believes that her supervisors were attempting to 'indoctrinate' her into their 'concept' of 'palliative

care to the dying.'"; (2) she "does *not* believe she 'lacked necessary listening, communication and

4

critical thinking skills'"; (3) she followed doctors' orders when administering pain medication; (4) she "does *not* believe she 'had difficulty following simple instructions'"; and (5) she "does *not* believe she 'was unable to work well with others on the Hospice staff."  (Dkt. #19 at 2-3). Culpepper has not submitted any valid summary judgment evidence, such as affidavits or deposition testimony, to support her assertions.

On October 15, 2004, Culpepper submitted two requests for "safe harbor peer review" to her supervisors.  (Dkt. #15-4 at 3-19); (Dkt. #15-2 at 19).  Culpepper submitted one request to Debra Reyes ("Reyes") and one request to Markland.  (Dkt. #15-4 at 3-19); (Dkt. #15-2 at 17, 26, 39). Both requests related to the treatment of a patient at the Twin Pines Nursing Home.  (Dkt. #15-4 at 3-19).  Also, both requests were made after Culpepper had engaged in the conduct that formed the basis of her requests.  (Dkt. #15-2 at 17-18, 40-42); (Dkt #15-4 at 3-19, 20).  When Culpepper submitted her requests, she was not on duty and had no pending assignments regarding the Twin Pines patient at issue.  (Dkt. #15-2 at 21-22, 26-27, 40-42); (Dkt. #15-3 at 14-16).

According to Hospice, Markland advised Culpepper that a safe harbor peer review request must be made when a nurse is on duty and before the care in question.  (Dkt. #15-3 at 14-18). Hospice's claims are supported by Markland's deposition testimony.  (Dkt. #15-3 at 14-18).

On November 4, 2004, Culpepper's employment was terminated by Markland, Mary Virginia Jacobs ("Jacobs") and Lynda Morgan, with input from Debra Reyes and Lori Koonce. (Dkt. #15-4 at 22); (Dkt. #15-3 at 18, 34).  The  reason for termination stated on Culpepper's discharge form reads as follows: "See personnel file for detailed information.  Employee not a match for the Hospice of So. team and philosophy."  (Dkt. #15-4 at 22).  Culpepper's "Introductory Period Evaluation" form, dated November 4, 2004, indicates that Markland, along with Morgan, the

Hospice Director of Human Resources, rated Culpepper as unsatisfactory or not meeting expectations in 10 out of 16 categories.  (Dkt. #15-4 at 1-2); (Dkt. #15-3 at 34).  According to Markland's deposition testimony, Culpepper was terminated largely due to the observations of her behavior during the 90-day orientation period.  (Dkt. #15-3 at 18-22, 24, 27-29).  Because of these various observations, Markland recommended Culpepper's termination.  (Dkt. #15-4 at 1-2); (Dkt. #15-3 at 18, 29-30).

Culpepper maintains that she was not allowed to work after submitting her peer review requests.  (Dkt. #19 at 3).  Furthermore, Culpepper argues that she was terminated after "what Plaintiff believes to have been continued harassment, intimidation, and attempts to indoctrinate her into their value system concerning hospice care that Plaintiff was questioning and attempting to understand."  (Dkt. #19).  Culpepper asserts that her problems primarily arose with Markland, Reyes, Shelly Long, and two unnamed assistants.  (Dkt. #19 at 3).  Culpepper's assertions are not supported by summary judgment evidence.

Hospice emphasizes that Culpepper testified at her deposition that she does not believe that any discrimination occurred on the basis of race, gender or national origin.  Indeed, Culpepper explicitly testified that she does not believe that she experienced any discrimination on the basis of race, gender or national origin.  (Dkt. #15-2 at 28-33).  Culpepper also testified that she believes that Markland favorably considered her age when hiring her.  (Dkt. #15-2 at 30-33).

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV.

P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).   To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact.  *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.  *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995).  "The court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).  However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations," or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

## Discussion

## I.      Title VII, ADEA and TCHRA Claims

Title VII prohibits adverse employment decisions based on an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). The determination of whether or not certain facts amount to adverse employment actions depends on whether not those facts constitute ultimate employment decisions. *Pryor v. Wolfe*, 196 Fed. Appx. 260, 262-63 (5th Cir. 2006)(per curiam); *Dollis v. Rubin*, 77 F.3d 777 (5th Cir. 1995)(per curiam). Ultimate employment decisions involve actions such as hiring, firing, granting leave, discharging, promoting and compensating. *Dollis*, 77 F.3d at 782. Title VII was not intended to create a cause of action for employment-related decisions that may have a tangential effect on ultimate employment decisions, but are not in and of themselves ultimate employment decisions. *Id.* (citations omitted). The standards applied under TCHRA are identical to those that apply under Title VII. *See Shackelford v. Deloitte & Touche*, 190 F.3d 398, 403 n.2 (5th Cir. 1999). The ADEA prohibits similar discriminatory treatment on the basis of age. 29 U.S.C. § 623(a)(1).

The burden shifting test announced in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to Culpepper's discrimination claims. Under the burden shifting test, the allocation of the burden of production and the order for presentation of proof is as follows: (1) the plaintiff must first establish a *prima facie* case of discrimination; (2) if the plaintiff meets his burden, then the burden of production shifts to the defendant to produce evidence of a legitimate nondiscriminatory reason for its actions; and (3) if the defendant produces a legitimate reason, then the presumption of discrimination vanishes, and the plaintiff must demonstrate a genuine issue of material fact that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142-43, 120 S.C.t 2097, 147 L.Ed.2d 105 (2000). The Court of Appeals for the Fifth Circuit has held that a *prima facie* case is established when evidence of the following is presented: (1) the plaintiff is a

member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff was subjected to an adverse employment action; and (4) the plaintiff was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably. *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001)(citations omitted).

In the case at bar, it is clear that Hospice is entitled to summary judgment on Culpepper's Title VII, ADEA and TCHRA discrimination claims. Culpepper has explicitly admitted that she does not believe that she was discriminated against on the basis of her sex, age or national origin. (Dkt. #15-2 at 28-33). To the contrary, Culpepper testified at her deposition that she believes that Markland may have preferred her during the hiring process because of her age. Any hiring preference given to Culpepper based on her age does not constitute actionable discrimination. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 584, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004). Moreover, Hospice has provided legitimate nondiscriminatory reasons for Culpepper's termination. (Dkt. #15-3 at 18-22, 24, 27-29). Culpepper has not created a material issue of fact showing that Hospice's nondiscriminatory reasons were merely a pretext. Also, the record does not contain any evidence showing that Hospice made any job assignment decision based on Culpepper's race, age or national origin.

It is equally clear that Hospice is entitled to summary judgment on Culpepper's retaliation claims. Under Title VII, an employer cannot discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice" by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). The ADEA, 29 U.S.C. § 623(d), and TCHRA,

9

TEX. LABOR CODE § 21.001(1), contain similar anti-retaliation provisions.   An employee's complaints to an employer do not constitute protected activity unless the complaints clearly relate to unlawful employment discrimination.  *E.g.*, *Baker v. Union Pac. R.R. Co.*, 145 F.Supp.2d 837, 844 (S.D. Tex. 2001).  In this case, Culpepper filed her charge of discrimination with the  Texas Workforce Commission Civil Rights Division and the EEOC only after she was terminated.  (Dkt. #15-4 at 23).  Furthermore, Culpepper testified at her deposition that she never complained about any discriminatory misconduct against her while she worked at Hospice.  (Dkt. #15-2 at 36-37).  Because all the evidence before the Court supports a finding that Culpepper did not engage in any protected conduct before she was terminated, Culpepper's retaliation claim cannot be sustained.

## II.   TEX OCC. CODE § 303.005 and TEX. ADMIN. CODE §§ 217.19 and 217.20 Claims

Culpepper has attempted to assert private causes of action under TEX OCC. CODE § 303.005 and TEX. ADMIN. CODE §§ 217.19 and 217.20.  (Dkt. #15-4 at 28-30).  Section 303.005 of the Texas Occupations Code is titled "Request for Peer Review Committee Determination" and sets forth certain rights and remedies pertaining to nursing peer review.  Section 303.005 provides, in part, as follows:

. . . .

(b) If a person who is required to establish a nursing peer review committee under Section 303.0015 requests a nurse to engage in conduct that the nurse believes violates a nurse's duty to a patient, the nurse may request, on a form developed or approved by the board, a determination by a nursing peer review committee under this chapter of whether the conduct violates a nurse's duty to a patient.

(c) A nurse who in good faith requests a peer review determination under Subsection (b):

(1) may not be disciplined or discriminated against for making the request;

(2) may engage in the requested conduct pending the peer review;

(3) is not subject to the reporting requirement under Subchapter I, Chapter 301; and

(4) may not be disciplined by the board for engaging in that conduct while the peer review is pending.

. . . .

(g) An appropriate licensing agency may take action against a person who violates this section.

(h) A person may not suspend or terminate the employment of, or otherwise discipline or discriminate against, a nurse who in good faith requests a peer review determination under this section or a person who advises a nurse of the nurse's right to request a determination or of the procedures for requesting a determination.  A violation of this subsection is subject to Section 301.413.

. . . .

Section 217.19 of the Texas Administrative Code is titled "Incident-Based Nursing Peer Review" and sets forth rules relating to minimum due process for nursing peer review.  Section 217.20 of the Texas Administrative Code is titled "Safe Harbor Peer Review for Nurses" and sets forth rules for safe harbor peer review for nurses.  Section 217.20 provides, in part, as follows:

(a) Texas Occupations Code §303.005 requires a person who regularly employs, hires or contracts for the services of at least ten (10) nurses to permit a nurse to request Peer Review when requested to engage in conduct that the nurse believes is in violation of his/her duty to a patient.  "Duty to a patient" means conduct, including administrative decisions directly affecting a nurse's ability to comply with that duty, required by standards of practice or professional conduct adopted by the Board.  A nurse requesting safe harbor in compliance with §303.005 and these rules is afforded the protections outlined in §303.005(c).

(b) Minimum Due Process.  The minimum due process requirements of rule 217.19 do not apply to the Safe Harbor Peer Review except in those circumstances outlined in rule 217.20(e)(2).  The peer review committee shall exclude from the committee any persons or person with administrative authority for personnel decisions directly affecting the nurse.  The nurse requesting safe harbor shall be permitted to:

11

(1) appear before the committee;

(2) ask questions and respond to questions of the committee; and

(3) make a verbal and/or written statement to explain why he or she believes the requested conduct would have violated a nurse's duty to a patient.

(c) Safe Harbor Protections.  To activate protections outlined in Texas Occupations Code §303.005, the nurse shall:

. . . .

(2) At the time the nurse is requested to engage in the activity, notify the supervisor making the assignment that the nurse is invoking Safe Harbor.

(3) At the time of supervisor notification, also submit a written request for Safe Harbor utilizing the Safe Harbor form provided on the Board's web site or on a form that includes a minimum of the following information:

(A) the conduct assigned or requested, including the name and title of the person making the assignment or request;

(B) a description of the practice setting (e.g., the nurse's responsibilities, resources available, extenuating or contributing circumstances impacting the situation);

(C) a detailed description of how the conduct would have violated the nurse's duty to a patient or any other provision of the Nursing Practice Act and Board Rules.  If possible, reference the specific standard (Rule 217.11) or other section of the Nursing Practice Act and/or Board rules the nurse believes would have been violated;

(D) any other copies of pertinent documentation available at the time.  Additional documents may be submitted to the committee when available at a later time; and

12

(E) the nurse's name, title, and relationship to the
supervisor making the assignment or request.

The Supreme Court of Texas has stated that when a private cause of action is alleged to derive from a constitutional or statutory provision, a court must ascertain whether the drafters intended to create a private right of action. *Brown v. De La Cruz*, 156 S.W.3d 560 (Tex. 2004)(citing *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 77 S.W.3d. 253, 260 (Tex. 2002)).  A private right of action is only to be recognized if the specific provisions at issue clearly imply such a right. *Brown*, 156 S.W.3d at 563.  Private causes of action may be implied only when a legislative intent to do so appears in the statute as written. *Id.* at 567.

It is clear that the statutes relied upon by Culpepper do not confer a private right of action. The Court acknowledges that Section 303.005 of the Texas Occupations Code prohibits discrimination against nurses who invoke nursing peer review under that section.  However, the statute does not explicitly grant nurses a right to sue.  Instead, the statute explicitly states that "an appropriate licensing agency may take action against a person who violates this section."  This statement clearly evidences the legislature's intent to only create a right of enforcement for "an appropriate licensing agency" and not for individual nurses under Section 303.005.  Similarly, Section 217.19 of the Texas Administrative Code and  Section 217.20 of the Texas Administrative Code do not contain any provisions granting nurses the right to sue.

The Court's finding is further supported by Section 301.413 of the Texas Occupations Code, which is referenced in Section 303.005.  Section 301.413 explicitly creates a private right of action for nurses who have been discriminated against because of their invocation of nursing peer review under Section 303.005.  Section 301.413 provides, in part, as follows:

. . . .

13

(b) A person may not suspend or terminate the employment of, or otherwise discipline or discriminate against, a person who:

. . . .

(2) requests, in good faith, a nursing peer review determination under Section 303.005.

(c) A person who reports under this subchapter, refuses to engage in conduct as authorized by Section 301.352, or requests a nursing peer review determination under Section 303.005 has a cause of action against a person who violates Subsection (b), and may recover:

(1) the greater of:

(A) actual damages, including damages for mental anguish even if no other injury is shown; or

(B) $5,000;

(2) exemplary damages;

(3) court costs; and

(4) reasonable attorney's fees.

Because the Texas legislature has enacted a statute explicitly granting nurses the right to sue when their rights are violated in relation to nursing peer review, the Court is unwilling to recognize a private right of action under Section 303.005 of the Texas Occupations Code, Section 217.19 of the Texas Administrative Code or Section 217.20 of the Texas Administrative Code.[2]

Even if this Court was to (1) recognize a private right of action under the statutes that Culpepper has relied upon; or (2) to allow Culpepper to assert a claim under Section 301.413 of the

---

[2] Culpepper has attached Section 301.352 of the Texas Occupations Code and Section 143.0093 of the Texas Health and Safety Code to her response to Hospice's motion for summary judgment. Neither of these statutes entitle Culpepper to a private right of action and the assertion of claims under these statutes at this late date is untimely.

14

Texas Occupations Code, Culpepper's claims would still fail.  Section 217.20 of the Texas Administrative Code explicitly requires that, in order to invoke the protections of Section 303.005, a nurse must: (1) notify the supervisor making the assignment in question, at the time the nurse is requested to engage in the questionable activity, that the nurse is invoking Safe Harbor Peer Review; and (2) at the time of supervisor notification, either submit a form provided by the Board or submit a written form with various information.  Culpepper has testified at her deposition that she did not complete either of these requirements in a timely fashion.  Furthermore, Culpepper has not provided any competent summary judgment evidence showing that she was suspended or fired because of her invocation of nursing peer review.  Accordingly, Culpeppers claims, in the alternative, would be foreclosed.

## III.   Conspiracy Claim

"The acts of an agent and a principal are the acts of a single entity, and cannot constitute conspiracy."  *Lyons v. Lindsey Morden Claims Management, Inc.*, 985 S.W.2d 86, 91 (Tex. App.–El Paso 1998)(citing *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995); *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 100 n.7 (Tex. App.–Houston 1995)).

In the case at bar, it is clear that Culpepper's conspiracy claim fails.  Culpepper's original petition states that Markland, Morgan and Koonce "were all authorized vice-principals, agents, representatives and/or employees of [Hospice], and said individuals were acting within the course and scope of their employment and/or position with [Hospice] when they engaged in the conduct [at issue]."  (Dkt. #15-2 at 5).  This position has not been controverted by any evidence before the Court.  Accordingly, because Culpepper concedes that all of the alleged conspirators are agents of Hospice or Hospice itself, Culpepper's conspiracy claim is without merit.

**Conclusion**

For the foregoing reasons, Defendant's Motion For Summary Judgment (Dkt. #15) is hereby GRANTED.

It is so ORDERED.

Signed this 11th day of February, 2008.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE